UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

WILLIE WALLACE THOMAS ET AL    CIVIL ACTION NO. 22-2159

VERSUS                         JUDGE EDWARDS

UNION PACIFIC RAILROAD CO       MAG. JUDGE HORNSBY

## MEMORANDUM RULING AND ORDER

Before the Court is a Motion for Partial Summary Judgment (R. Doc. 32) filed by Union Pacific Railroad Company ("Defendant" or "Union Pacific"). Willie Thomas ("Thomas") and Jennifer Thomas (together "Plaintiffs") oppose (R. Doc. 34). Defendant replied (R. Doc. 35).

Having carefully considered the parties' memoranda and the applicable law, Defendant's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This suit stems from an incident that occurred on May 27, 2021, at 2232 Hollywood Ave., Shreveport, Louisiana (the "Property").[1] As an initial matter, Plaintiffs contend that the Property "was in the care, custody, control and managed by [P]laintiff[s]."[2] Additionally, Plaintiffs have a purported 10 year lease over the Property (the "Lease").[3] Upon arriving at the Property, Thomas "noticed several loads

---

[1] *See* R. Doc. 14 at ¶¶ 7, 13.
[2] *Id.* at ¶ 6.
[3] *See* R. Doc. 34-2 at 1. The Lease is between Living Word Christian Fellowship and Thomas for a term of ten (10) years and a sum certain rent of $1,000.

of track ballast"[4] and "heavy equipment" (the "Material"), which was placed on the Property by Union Pacific crewmen.[5] Plaintiffs claim that Union Pacific was performing a track maintenance project on the railroad adjacent to the Property and used the Property's parking lot for the Material.[6]

According to Plaintiffs, Union Pacific's crew lacked "permission or authorization" to place the Material on the Property.[7] Thomas approached the foreman on scene to determine the reason why the Material was placed on the Property, to which the foreman stated that he thought "it would be ok to use the [P]roperty."[8] Once Thomas "informed the foreman" of their unwanted presence, "[t]he foreman apologized" and "informed the crew members to remove all equipment from the [P]roperty."[9] However, the crew members did not remove the Material because Thomas refused to permit its removal;[10] instead, the crew members exited the Property.[11] Plaintiffs then allege that, while placing caution tape around the Material, Thomas "stepped on one of the track ballast" causing him to fall and injure "his right ankle, right knee, left arm, and back."[12]

By June 10, 2021, an agent for Union Pacific contacted Thomas to discuss the removal of the Material.[13] The parties entered into an agreement—a Temporary

---

[4] "[T]he rocks that form the track bed upon which railroad ties and track are laid." R. Doc. 32-1 at 5, fn. 2.

[5] R. Doc. 14 at ¶¶ 7–8.

[6] *See id.* at ¶ 9; *see also* R. Doc. 32-1 at 5.

[7] R. Doc. 14 at ¶ 9.

[8] *See id.* ¶ 9.

[9] *See id.* at ¶¶ 10–11.

[10] R. Doc. 32-1 at 5.

[11] R. Doc. 14 at ¶ 12.

[12] *Id.* at ¶ 13.

[13] *See id.* at ¶¶ 17–18.

Construction Easement (the "Agreement")—allowing for the removal of the Material from the Property.[14] The Agreement provided that Union Pacific "lawfully seized" the Property, which would be "free from encumbrances."[15] The Agreement further stated that Thomas would "warrant and defend … against the lawful claims of all persons…."[16] Subsequent to the Agreement and payment by Defendant, the Material was removed on June 12, 2021.[17]

According to Plaintiffs, no further issues occurred on the Property until June 29, 2021.[18] Thomas arrived to the Property after being informed of a workmen presence on the Property.[19] A disagreement ensued as Thomas immediately instructed the workers to leave the Property but refused to relinquish the equipment to the workers.[20] Due to this disagreement, officers from the Shreveport Police Department were dispatched.[21] Following discussions with the officers, Thomas "allowed the foreman's crew to move the construction equipment."[22]

As a result of the May 27, 2021 incident, Thomas sought medical treatment on June 15, 2021 due to the intensifying of his injuries.[23] From June 15, 2021 to June 29, 2021, Thomas received several X-Rays and an MRI scan illustrating the extent of

---

[14] *Id.* at ¶ 18; *see* R. Doc. 32-1 at 6; *see* R. Doc. 32-3.
[15] R. Doc. 32-3 at 1.
[16] *Id.* at 1.
[17] R. Doc. 14 at ¶ 19. Union Pacific agreed to pay Plaintiffs $8,000 for a temporary construction easement on the Property. *See* R. Doc. 32-3.
[18] *See* R. Doc. 14 at ¶¶ 33–34.
[19] *See id.* at ¶¶ 34–35. The parties dispute whether Union Pacific employees were on site on June 29, 2021. Defendant argues that the crew on site on June 29, 2021, was "an independent construction contractor, Kenneth Evertt & Sons." R. Doc. 32-1 at 23. Thomas deposed that he did not know who the workers were employed with at the time of the incident. *See* R. Doc. 32-4 at 17–18.
[20] R. Doc. 14 at ¶ 36; *see* R. Doc. 32-1 at 23.
[21] *See* R. Doc. 14 at ¶¶ 36–38.
[22] *Id.* at ¶ 45.
[23] *See id.* at ¶ 21.

his injuries.[24] Because Thomas's pain continued, he visited several more medical providers in an effort to reduce his pain.[25] Finally, on September 16, 2021, Thomas was referred to Dr. Bharat Guthikonda ("Dr. Guthikonda").[26] Dr. Guthikonda informed Thomas that he needed "immediate surgery" due to this injuries, which later relieved some of Thomas's pain.[27] But Thomas's relief was only temporary, requiring Dr. Guthikonda to order an ESI injection for Thomas's pain.[28] The medical treatment was to no avail, and Thomas claims to continue to suffer pain.[29]

Plaintiffs filed their civil action in the First Judicial District Court in Caddo Parish, Louisiana on May 31, 2022.[30] In their action, Plaintiffs allege that Defendant is liable for trespass, personal injury damages, intentional infliction of emotional distress ("IIED"), and negligent hiring, retention, training, and/or supervision.[31] Defendant thereafter timely removed the case on July 19, 2022.[32] After Plaintiffs amended their Complaint, Defendant filed the instant motion on October 16, 2023.[33] Defendant moves for summary judgment on the following grounds: (1) Plaintiffs lack standing or have otherwise comprised their trespass claim; (2) Plaintiffs cannot prove medical causation; (3) Plaintiffs cannot establish intentional infliction of emotional

---

[24] *See id.* at ¶¶ 21–32. Dr. Shirley Tan ordered these scans due to Thomas's "chronic bilateral thoracic back pain, acute left ankle pain, acute pain of left shoulder[,] and acute right ankle pain."

[25] *See id.* at ¶¶ 50–60.

[26] *See id.* at ¶¶ 61–62. Dr. Guthikonda is a Board-certified neurosurgeon. *See* R. Doc. 32-7 at 8.

[27] *See* R. Doc. 14 at ¶¶ 63–64.

[28] *See id.* at ¶¶ 72–75.

[29] *See id.* at ¶¶ 74–75.

[30] *See* R. Doc. 1-1.

[31] *See* R. Doc. 14 at 14–19.

[32] *See* R. Doc. 1.

[33] *See* R. Doc. 14; R. Doc. 32.

distress; (4) Plaintiffs cannot establish a loss of business opportunity claim; and (5) Plaintiffs' loss of consortium claim must be limited.[34]

## SUMMARY JUDGMENT STANDARD

Under Rule 56(a), summary judgment shall be granted when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[36] "A dispute is genuine if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-moving party."[37] "[A] party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record."[38] In evaluating a motion for summary judgment, a court "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."[39]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, … [and] the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[40] "The moving party

---

[34] *See* R. Doc. 32.

[35] Fed. R. Civ. P. 56(a).

[36] *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[37] *Id.* (internal citations omitted).

[38] Fed. R. Civ. P. 56(c)(1)(A).

[39] *Total E&P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (internal citations omitted).

[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).

may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no such support for the non-moving party's claim."[41] If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists.[42] If the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.[43]

Pleadings filed by *pro se* litigants must be construed liberally and under less stringent standards.[44] But this liberal construction does not negate a *pro se* litigant's burden under Rule 56. *Pro se* litigants are required to "properly … present summary judgment evidence" to defeat summary judgment.[45]

## LAW AND ANALYSIS

### I. Plaintiff's Trespass Claim

Under Louisiana Civil Code article 2315, a plaintiff may bring an action for trespass "when there is an unlawful physical invasion of the property or possession of another."[46] To bring such an action, a plaintiff must either be an owner or possessor of the property in question.[47] Once a plaintiff proves damages as a result of a trespass,

---

[41] *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).

[42] *Celotex Corp.*, 477 U.S. at 324.

[43] *Stahl*, 283 F.3d at 263.

[44] *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *see also Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006).

[45] *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (citation modified).

[46] *Taylor v. Denka Performance Elastomer, LLC*, 332 F.Supp.3d 1039, 1055 (E.D. La. 2018) (citing *Richard v. Richard*, 24 So.3d 292, 296 (La. App. 3 Cir. 11/04/09)) (citation modified).

[47] *LaRue v. Crown Zellerback Corp.*, 512 So.2d 862, 863 (La. Ct. App. 06/23/87), *writ denied*, 514 So.2d 1176 (La. 1987) (internal citations omitted).

6

recovery of general damages may include mental and physical pain, anguish, distress, and inconvenience.[48]

Defendant presents two bases for its argument that Plaintiffs cannot prevail on their trespass claim. First, Defendant asserts that Plaintiffs lack standing to bring a trespass claim.[49] Second, Defendant claims that Plaintiffs "compromised" any claim for trespass against Defendant.[50] The Court will analyze each separately.

### a. Whether Plaintiffs have Standing for their Trespass Claim

Defendant first argues that Plaintiffs lack standing to assert and, thus, recover damages under a trespass claim.[51] Defendant claims that, to have standing, Plaintiffs must either be "owner[s] or" have some "other possessory interest in the [P]roperty."[52] But Defendant appears to argue that, because Plaintiffs have failed to prove ownership, Plaintiffs cannot bring a claim for trespass.[53] Not so. Defendant admits that a possessor of property can bring a trespass claim.[54] Here, Plaintiffs assert their possessory interest in the Property through their Lease.[55]

Defendant avers that Thomas's Lease "should be stricken and not considered for failure to produce in discovery." Federal Rule of Civil Procedure 37(c)(1) provides that a party who failed to disclose information under Rule 26(a) or (e) cannot rely on

---

[48] *Fleischmann v. Duckworth*, 2022 WL 2232680, at *3 (La. App. 5 Cir. 06/22/22) (internal citations omitted).

[49] R. Doc. 32-1 at 10.

[50] *Id.* at 15.

[51] *Id.* at 10–11.

[52] *Id.* at 11.

[53] *See id.* at 11–15.

[54] *See id.* at 10; *see LaRue*, 512 So.2d at 863 (internal citations omitted).

[55] R. Doc. 34-2 at 1.

such undisclosed evidence on a motion unless the failure to disclose is harmless.[56] In determining whether a violation of Rule 26(a) or (e) is harmless, the Fifth Circuit considers several factors, such as: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose."[57]

Here, the importance of producing a written lease agreement bears little on the outcome of this decision, as discussed below. Defendant provides no argument as to the prejudicial effect that would arise upon the Court considering the fact that Thomas was a lessee of the Property.[58] Plaintiffs, in attaching the Lease to their Opposition, do not explain their failure to produce it in discovery.[59] However, Thomas disclosed the existence of the Lease in his deposition on May 9, 2023, when he testified that he was "a leaseholder."[60] Thus, Defendant has failed to demonstrate that the failure to produce a copy of the written Lease caused a prejudicial surprise warranting its exclusion for the limited purpose of establishing Plaintiffs' possessory interest in the Property.[61] In any event, even if the Court did not consider the Lease document itself, the Court still considers Thomas's capacity as a lessee because a valid lease is not contingent upon a written agreement.[62]

---

[56] *See* Fed. R. Civ. Proc. 37(c)(1).

[57] *Joe Hand Promotions, Inc. v. Chios, Inc.*, 544 Fed. Appx. 444, 447 (5th Cir. 2013) (citing *Tex. A & M Research Found. V. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)).

[58] *See* R. Doc. 35 at 6.

[59] *See id.* at 6. Defendant only provides that the Lease must be stricken because Plaintiff did not produce the Lease in discovery and failed to supplement the Lease thereafter.

[60] R. Doc. 32-4 at 1, 13.

[61] *See Joe Hand Promotions, Inc.*, 544 Fed. Appx. at 447.

[62] *See* La. Civ. Code art. 2681.

In the alternative, Defendant contends that the Lease is invalid due to Thomas's failure to pay rent.[63] Defendant further argues that Thomas's "reference to some future $1,000 per month" rent is "purely potestative and prohibited under Louisiana law."[64] Again, not so. A valid lease requires three elements: (1) the thing, (2) the price, and (3) the consent of the parties.[65] Article 2676 does not require rent to be paid immediately or on a certain date. Rather, article 2676 only requires an agreement to rent that is either "sum certain or determinable."[66] Article 2703 also provides that rent is due at the beginning of the term "[i]n the absence of a contrary agreement."[67] Here, a contrary agreement exists as the lessor, Living Word Christian Fellowship, agreed to lease Thomas the premises at a sum certain to be paid at a future date.[68] Thus, all three essential elements for a valid lease—albeit an oral lease—exist here.

Defendant's argument as to the "potestative [suspensive] condition" here is also flawed.[69] Louisiana Civil Code article 1770 provides that "[a] suspensive condition that depends solely on the whim of the obligor makes the obligation null." Thomas's assertion that rent would be paid when he began "getting the building operational" on the Property does not constitute a suspensive condition relying on the

---

[63] *See* R. Doc. 32-1 at 13–14.
[64] *Id.* at 14.
[65] La. Civ. Code art. 2670.
[66] La. Civ. Code art. 2676.
[67] La. Civ. Code art. 2703.
[68] *See* R. Doc. 32-4 at 13; R. Doc. 34-2 at 1.
[69] Potestative was the term used in former Code articles for suspensive conditions dependent on an obligor's whim. La. Civ. Code arts. 2024 (1870), *amended and recodified at* La. Civ. Code art. 1770 (1984); *see also* La. Civ. Code art. 1770, Revision Comments (e) ("This Article eliminates the expression 'potestative condition'….").

obligor's whim and, thus, does not run afoul of article 1770. Instead, this "condition" is a suspensive term.

"A term for the performance of an obligation is a period of time either certain or uncertain."[70] A suspensive term "postpones the exigibility of the performance."[71] Thomas's testimony is instructive here. Thomas deposed that "once the building [was] operational," then rent would be due.[72] The question was not "if" the building became operational but "when" the building became operational. Thus, the agreement asserted by Thomas embodied a suspensive term, not a suspensive condition, postponing the exigibility of performance.[73] A landlord is entitled to confer possession of a thing in exchange for rent to be paid at an uncertain date, where such an agreement will, as here, form a valid lease.

Louisiana Civil Code article 2702 states that "[e]xcept as otherwise provided in Article 2700, the lessor is not bound to protect the lessee's possession against a disturbance caused by a person who does not claim a right in the leased thing. In such a case, the lessee may file any appropriate action against that person."[74] Thus, article 2702 affords a "lessee … a right of action for damages sustained against the person occasioning the disturbance."[75] Louisiana Civil Code article 3659 defines a disturbance as "an eviction or any other physical act that prevents the possessor of

---

[70] La. Civ. Code art. 1778.
[71] See 5 Saúl Litvinoff & Ronald J. Scalise Jr., Louisiana Civil Law Treatise: Law of Obligations § 6.8 (2d ed. 2001).
[72] R. Doc. 32-4 at 13.
[73] See 5 Saúl Litvinoff & Ronald J. Scalise Jr., Louisiana Civil Law Treatise: Law of Obligations § 6.8 (2d ed. 2001).
[74] La. Civ. Code art. 2702.
[75] *Potter v. First Fed. Sav. & Loan Ass'n of Scotlandville*, 615 So.2d 318, 323–24 (La. 1993).

immovable property or a right therein from enjoying his possession quietly or that throws an obstacle in the way of that enjoyment."[76] Therefore, a lessee may file an action for property damage for any physical act that prevents a lessee from enjoyment of the property.[77] As such, Plaintiffs have standing to bring a trespass claim.

### b. Whether Plaintiffs Compromised their Trespass Claim

Now to Defendant's position that the trespass claim has since been compromised. Defendant argues that "any claim for trespass … was compromised…" due to the entering of the Agreement between Thomas and Union Pacific.[78] The Agreement—a temporary construction easement—provides for the "storage and removal of ballast" on the Property.[79] The Agreement further states that Thomas "shall warrant and defendant … against the lawful claims of all persons…."[80]

Louisiana defines a compromise as "a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship."[81] However, "[a] compromise settles only those differences that the parties clearly intended to settle[.]"[82] The language in the Agreement does not clearly reflect the parties intent to settle

---

[76] *See Indian Harbor Ins. Co. v. Covington Flooring Co., Inc.*, No. 24-30243, 2025 WL 416992, at *3 (5th Cir. 2025).

[77] Defendant's argument that La. Civil Code art. 2691 excludes a lessee's ability to pursue a trespass claim is misplaced. Article 2691 provides a mechanism for a lessee, such as Plaintiffs, to seek recourse against a lessor for necessary repairs of the thing leased.

[78] R. Doc. 32-1 at 15.

[79] R. Doc. 32-3 at 1.

[80] *Id.*

[81] La. Civ. Code art. 3071.

[82] La. Civ. Code art. 3076.

Plaintiffs' trespass claim. Given the lack of clarity in the Agreement, a genuine issue of material fact exists as to whether the agreement constituted a settlement.

Thus, since Plaintiffs have standing to bring a trespass claim and since the Agreement is not clear as to whether a settlement occurred, summary judgment is not appropriate as to Plaintiffs' trespass claim.

## II.    Evidence of Medical Causation

Defendant also seeks summary judgment on the grounds that Plaintiffs cannot prove medical causation.[83] Defendant argues that Plaintiffs cannot establish medical causation from the fall to any of Thomas's three surgeries.[84]

"In a personal injury suit, plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury."[85] Plaintiffs must prove causation by a preponderance of the evidence. To determine this causal relationship, a plaintiff must "prove[] through medical or lay testimony that it is more probable than not that the subsequent injuries were caused by the accident."[86] Although medical testimony is traditionally favored and sometimes required by courts to prove causation, causation can still be shown through other direct or circumstantial evidence, including common knowledge.[87] However, "when the conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required."[88] "A trial court has wide

---

[83] R. Doc. 32-1 at 15.
[84] *See id.* at 16–21.
[85] *Maranto v. Goodyear Tire & Rubber Co.*, 650 So.2d 757, 759 (La. 1995).
[86] *Kliebert v. Breaud*, 134 So.3d 23, 28 (La. App. 5 Cir. 01/31/14).
[87] *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993).
[88] *Hutchinson v. Shah*, 648 So.2d 451, 452 (La. App. 1 Cir. 12/22/94).

discretion to admit or exclude expert testimony."[89] Nevertheless, "[c]ausation is an issue of fact that is generally decided at trial on the merits."[90]

First, Defendant claims that Thomas's thoracic spine surgery did not derive from the fall.[91] Defendant relies on Dr. Guthikonda's testimony and Dr. David Smith's ("Dr. Smith") report.[92] Dr. Guthikonda opined that the thoracic spine surgery was needed due to the existence of "discitis, osteomyelitis, epidural abscess collection, and kyphosis" in Thomas's spine.[93] Dr. Guthikonda further provided that Thomas's injuries and pain "could be a result of the fall" but "it is certainly difficult to say."[94] However, Dr. Smith stated that Thomas's thoracic spine abnormalities were "definitely and unequivocally those of discitis with osteomyelitis" and not from a "traumatic injury after the first fall."[95]

Second, as to the cervical spine surgery performed on May 11, 2022, Dr. Guthikonda stated that he could not opine on the causation of Thomas's cervical pain as he was not an expert in that area.[96] Dr. Smith observed "only degenerative changes" rather than traumatic injuries from the fall on Thomas's cervical spine.[97]

---

[89] *Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284, 1287 (5th Cir. 1990); *see also Viterbo v. Dow Chemical*, 826 F.2d 420, 422 (5th Cir. 1987) (holding that "[i]n rulings on the admissibility of expert opinion evidence[,] the trial court has broad discretion....") (internal citations omitted).

[90] *Jones v. Tim Williams Wood Prods., LP*, No. 18-826, 2020 WL 3815265, at *6 (W.D. La. July 6, 2020) (quoting *Estate of Adams v. Home Health Care of Louisiana*, 775 So.2d 1064, 1065 (La. 2000)).

[91] *See* R. Doc. 32-1 at 16–19.

[92] *See id.* at 16. Defendant provides that Dr. Smith is "a professor and diagnostic radiologist" who reviewed all of Thomas's imaging following the incident on May 27, 2021.

[93] *See* R. Doc. 32-7 at 20.

[94] *See id.* at 17–18.

[95] R. Doc. 32-9 at 3.

[96] *See* R. Doc. 32-7 at 27–28.

[97] *See* R. Doc. 32-9 at 1.

Third, Dr. Guthikonda opined that Thomas's lumbar spine surgery on March 21, 2023, likely occurred as a result of a motor vehicle accident that Thomas had after the cervical spine surgery.[98] Dr. Smith concurred in providing that "no evidence of trauma" existed as to Thomas's lumbar spine following the fall in May 2021.

Plaintiff, however, contends that he received treatment only for "the fall reported in May 2021" and, thus, these surgeries only occurred as a result of Defendant's actions.[99] To prove medical causation, Plaintiffs rely on Dr. Steve Allison, a doctor of physical therapy ("Dr. Allison"), who opined that "[t]here is nothing else in [Thomas's] history other than the 05/27/2021 trip and fall accident that would indicate a cause of the severity of his current chronic pain conditions, physical impairments, functional limitations/restrictions, and loss of enjoyment of life activities."[100]

In its Reply, Defendant asserts that "physical therapists are barred from opining on medical causation of injuries."[101] Defendant relies on *Allemore v. Camellia Hospice of Louisiana*, where the Louisiana First Circuit held that "a person must have an M.D. or a D.O. degree and a duly recorded license in order to be a physician and to engage in the 'practice of medicine.' Only with those qualifications can an individual diagnose an injury or its cause."[102] The Court agrees.

---

[98] *See* R. Doc. 32-8 at 15–16.
[99] *See* R. Doc. 34 at 12–13.
[100] *Id.* at 13; *see* R. Doc. 34-2 at 24.
[101] R. Doc. 35 at 2.
[102] 2014 WL 3583546, at *6 (La. App. 1 Cir. 07/21/14), *writ denied*, 152 So. 3d 872 (La. 2014).

14

"In the absence of expertise in an ancillary field," the Fifth Circuit has held that "a non-physician is not qualified to give medical testimony."[103] Dr. Allison is not a medical doctor.[104] While Dr. Allison may evaluate patients and provide treatment options, his qualifications and degrees in physical therapy do not align with or support his challenged medical causation testimony as to Thomas's injuries. There is no evidence to suggest that Dr. Allison can offer expert testimony outside his area of practice—physical therapy. Thus, Dr. Allison cannot make a diagnosis as to the cause of Thomas's injuries.

Nevertheless, taking Dr. Guthikonda's testimony that the thoracic spine injury could have resulted from the fall in a light most favorable to Plaintiffs, a genuine issue of material fact exists as to whether the May 27, 2021, fall caused Thomas's thoracic spine injuries. Absent any other expert medical testimony pertaining to medical causation, Plaintiffs have not shown a genuine issue of material fact as to medical causation for the cervical spine and lumbar spine injuries. Thus, Defendant is entitled to summary judgment on Thomas's cervical spine and lumbar spine injuries.

---

[103] *Carlson v. Bioremedi Therapeutic Systems, Inc.*, 822 F.3d 194, 200 (5th Cir. 2016) (citing *Edmonds*, 910 F.2d at 1286–87 (holding that a psychologist could not offer medical testimony to a patient's heart disease)).

[104] *See* R. Doc. 34-2 at 25. Dr. Allison's own report acknowledges that "[w]hile physicians (medical doctors) are trained to provide medical diagnoses based on an assessment of clinical and laboratory findings, the American Medical Association (AMA) recognizes that most physicians are not trained in assessing an individual's work ability or disability." Medical diagnoses are not a question of assessment but a question of causation. *See Kliebert v. Breaud*, 134 So.3d 23, 28 (La. App. 5 Cir. 01/31/14).

### III.    Plaintiffs' Intentional Infliction of Emotional Distress Claim

To establish a claim of intentional infliction of emotional distress ("IIED"), a plaintiff must establish the following: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[105] This standard is demanding. "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[106] This does not include and, thus, liability cannot be assessed to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[107] As to severity, "[t]he distress suffered must be [so extreme] that no reasonable person could be expected to endure it."[108] Lastly, the defendant must intend to cause this severe emotional distress and nothing less.[109]

Defendant asks this Court to grant summary judgment on Plaintiffs' claims that it intentionally inflicted emotional distress on Thomas. In support, Defendant asserts that Thomas's interactions with Union Pacific's foreman "fall woefully short of" the IIED standard.[110] Defendant contends that Thomas informed Union Pacific's foreman "to remove all equipment from the [P]roperty" on May 27, 2021.[111] Following

---

[105] *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).
[106] *Id.*
[107] *Id.*
[108] *Id.* at 1210.
[109] *Id.*
[110] R. Doc. 32-1 at 22.
[111] *Id.*

Thomas's request to remove the equipment, Defendant states that its foreman "provided [P]laintiff with the proper contact information and avenues to resolve the issue."[112] After the initial exchange, Defendant contends that Thomas had two more interactions with workers on the Property: on June 29, 2021, when police were called after Thomas refused to allow crewmen to remove their equipment from the Property,[113] and on November 22, 2021, when Thomas observed but did not engage or otherwise interact with an alleged employee of Defendant.[114] Defendant argues that these interactions cannot be said to be severe or outrageous.[115]

Defendant also contends that, regardless of the outrageousness of the alleged conduct, Plaintiffs fail to demonstrate how the emotional distress suffered was severe.[116] In support of this position, Defendant cites to a PHQ2 test that Thomas took on July 29, 2021.[117] Thomas responded to the test by indicating that he did not feel "down, depressed, or hopeless."[118] Thus, Defendant argues that Plaintiffs cannot present evidence such that the damages suffered were severe.

Plaintiffs, in opposition, failed to address the IIED arguments presented by Defendant. In their Amended Complaint, Plaintiffs claim that Defendant is liable for IIED caused by Defendant's actions.[119] In so claiming, Plaintiffs state that Defendant's "dumping track ballast in the parking lot of Plaintiff's business" along

---

[112] *Id.* at 23; *see* R. Doc. 32-4 at 15–16. Thomas deposed that Defendant's foreman gave him a claim number and form to resolve any property damage issue.

[113] R. Doc. 32-1 at 23; *see* R. Doc. 34-4 at 19–20.

[114] R. Doc. 32-1 at 24; *see* R. Doc. 14 at 13.

[115] R. Doc. 32-1 at 22–24.

[116] *Id.* at 24.

[117] *Id.*; R. Doc. 32-14 at 2.

[118] R. Doc. 32-1 at 24–25; R. Doc. 32-14 at 2.

[119] R. Doc. 14 at ¶ 78.

17

with "having heavy equipment on new concrete" caused "Plaintiff to suffer emotional distress which was and continues to be severe in nature."[120] Plaintiffs further aver that Defendant caused further distress when Defendant "false[ly]" accused Thomas of stealing.[121]

The Court agrees with Defendant. Plaintiffs have pled no facts nor point to any evidence in the record of such conduct that is extreme, outrageous, and exceeds "all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."[122]

First, on May 27, 2021, Defendant's employee "apologize[d]" to Thomas for entering the property without consent.[123] The employee then gave Thomas the necessary information to resolve any property damage issue deriving from the Material.[124] This conduct is inconsistent with the "extreme" or "outrageous" standard. Second, the workers' actions on June 29, 2021, also fall short of the IIED standard. A worker on site called the police and alleged that Thomas was stealing equipment from the crewmen.[125] The police advised Thomas of these allegations and informed Thomas that it was a civil matter.[126] During this conversation, a worker allegedly commented to Thomas that "we've got ways to handle people like [Thomas]."[127] Regardless of

---

[120] *Id.* (citation modified).

[121] *Id.*

[122] *Deville v. Robinson*, 132 So.3d 1277, 1280 (La. App. 3 Cir. 02/26/14), (citing *White*, 585 So.2d at 1209).

[123] R. Doc. 32-4 at 14.

[124] *Id.* at 14–15.

[125] R. Doc. 32-1 at 23; R. Doc. 32-4 at 20–21.

[126] R. Doc. 32-4 at 20–21. Thomas deposed that the police threatened to arrest him for theft.

[127] *Id.* at 22.

18

whether Union Pacific is responsible for this worker,[128] this conduct—calling the police and the alleged threat—is insufficient to substantiate an IIED claim, which required Plaintiffs to prove extreme and outrageous conduct.

Even if the record before the Court could lead a reasonable person to conclude that the conduct was outrageous or extreme, Plaintiffs have failed to illustrate that Defendant intended to cause any emotional distress, let alone severe distress.[129] To the extent Thomas suffered any emotional distress, Defendant could not have known or have been substantially certain that placing the Material on the Property, calling the police, or making a comment would result in extreme emotional distress.[130]

The Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact on their IIED claim—thus, warranting summary judgment.

## IV.    Plaintiffs' Loss of Business Opportunity Income Claim

In this case, Plaintiffs have also alleged a claim for loss of business income relating to a purported lease of a cell tower with Crown Castle.[131] Defendant moves for summary judgment and asserts that no genuine issue of material fact exists as to Plaintiffs' inability to assert such a claim.[132] Defendant requested from Crown Castle

---

[128] Defendant argues that the crew on site on June 29, 2021, was "an independent construction contractor, Kenneth Evertt & Sons." R. Doc. 32-1 at 23. The police report attached to Defendant's Motion indicates that Kenneth Evertt & Sons contracted through Defendant. R. Doc. 32-10 at 1. Thomas deposed that he did not know who the workers were employed with at the time of the incident. *See* R. Doc. 32-4 at 17–18.

[129] *See Curran v. Aleshire*, 67 F.Supp.3d 741, 754–55 (E.D. La. 2014) (holding that the evidence before the court failed to indicate that the defendant desired to inflict distress or knew that such distress would result as a result of the defendant's conduct).

[130] *See, e.g., Nwachukwu v. U-Haul Co. of Louisiana*, No. 23-1864, 2025 WL 903127, *8 (E.D. La. Mar. 25, 2025), *appeal dismissed*, No. 25-30181, 2025 WL 2745789 (5th Cir. 2025) (holding that reporting an incident to the police could not rise to the level of extreme and outrageous conduct necessary to substantiate an IIED claim).

[131] R. Doc. 14 at 15.

[132] R. Doc. 32-1 at 25.

any agreement it had with Thomas, to which Crown Castle responded: "we could not locate any agreements, contracts, servitudes, easements, and/or rights-of-way agreements, nor records of any fees paid between Crown Castle and Willie Wallace Thomas."[133] As such, Defendant argues that Plaintiffs cannot claim damages related to loss of business income with Crown Castle.[134] Plaintiffs failed to dispute Defendant's argument in their Opposition. Thus, Defendant has shown that no genuine issue of material fact exists and an entitlement to judgment as a matter of law on Plaintiffs' loss of business income claim.

## V.    Plaintiffs' Loss of Consortium Claim

Defendant lastly seeks judgment on Plaintiffs' remaining claims of loss of consortium. "A loss of consortium claim is a derivative claim and cannot be maintained if the primary claim is not viable as a matter of law."[135] Since the Court has found that Thomas's claim as to his thoracic injury has survived summary judgment, the consortium claim will not be dismissed.

---

[133] R. Doc. 32-12.

[134] *See* R. Doc. 32-1 at 25.

[135] *Williams v. Genesis Energy, LLC,* No. 20-35, 2021 WL 1227873, at *13 (M.D. La. Mar. 31, 2021).

20

## CONCLUSION

Considering the foregoing,

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment (R. Doc. 32) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' trespass claim and claims related to injuries to Thomas's thoracic spine and loss of consortium remain.

**THUS DONE AND SIGNED** in Chambers this 12th day of March, 2026.

_____
**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**